Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email:  rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email:  rc@rosscornelllaw.com

Attorneys for Plaintiff, SAMUEL DAWKINS

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL DAWKINS, on behalf of himself and all similarly situated persons,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>CITIZENS FINANCIAL GROUP, INC., a Delaware corporation; and CITIZENS BANK, NATIONAL ASSOCIATION, a national banking association,<br><br>　　　　　　Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1.    Plaintiff SAMUEL DAWKINS ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendants CITIZENS FINANCIAL GROUP, INC., a Delaware corporation, and CITIZENS BANK, NATIONAL ASSOCIATION, a national banking association (collectively, "Defendants" or "Citizens"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

2.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.citizensbank.com (the "Website"), a website that Defendants jointly own, operate, and provide for public access and use.

3.    During his use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendants were causing and permitting Third Parties to intercept the content of his communications and reveal his personal and sensitive browsing activity, including pages communicating his verbatim search query for "debt management" and communications reflecting his interests in reducing debt and financial stress.

4.    Defendants caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing, the page titles, descriptive event slugs that themselves restate the content of each page, and the referrer URLs reflecting prior navigation, all of which were transmitted to the Third Parties during the page-load process itself.

5.    As set forth in the Specific Allegations section of this Complaint below, Defendants surreptitiously embed and operate third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendants intentionally deploy these technologies to accomplish their commercial objectives, including identity resolution, audience segmentation, and the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

monetization of users' browsing activity through targeted advertising and real-time bidding.

6. Defendants deploy these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendants have done so from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II.    GENERAL ALLEGATIONS

7. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

8. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, search-query parameters, page titles, and referrer URLs reflecting prior navigation.

9. When users visit the Website, Defendants cause tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Glassbox Tracker
- The Google Trackers
- The Microsoft Bing UET Tracker
- The Demandbase Tracker
- The Qualtrics SiteIntercept Tracker

10. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising, identity-resolution, and audience-measurement ecosystems, and for data monetization strategies that go beyond Defendants' direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the "Third Parties."

11. The Trackers are operated by distinct third parties, including Glassbox Digital Ltd., Google LLC, Microsoft Corporation, Demandbase, Inc. and Qualtrics, LLC. Defendants knowingly embed and deploy the Trackers on the Website to facilitate the third parties' interception of the contents of users' electronic communications.

12. The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

13. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendants did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

14. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

### III.   PARTIES

15. Plaintiff SAMUEL DAWKINS is a California citizen residing in Tulare County, California, and has an intent to remain there. Plaintiff was in California, in Tulare County, when he visited the Website, which occurred on multiple occasions during the class period including but not limited to on May 1, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

/ / /

4

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

16.    Defendant CITIZENS FINANCIAL GROUP, INC. is a Delaware corporation with its principal place of business in Providence, Rhode Island. CITIZENS FINANCIAL GROUP, INC. is the parent holding company of Defendant CITIZENS BANK, NATIONAL ASSOCIATION and its family of operating entities.

17.    Citizens owns, operates, and controls the Website. Citizens' own Online Privacy Policy expressly applies to and covers Citizens Financial Group, Inc. together with its family of companies including Citizens Bank, N.A., and Citizens Financial Group, Inc. uses the unified label "Citizens" throughout that policy to refer jointly to itself and to its operating subsidiaries.

18.    Defendant CITIZENS BANK, NATIONAL ASSOCIATION is a national banking association. CITIZENS BANK, NATIONAL ASSOCIATION is the principal operating bank subsidiary of CITIZENS FINANCIAL GROUP, INC., and is registered to do business in the State of California, including directly with California consumers.

19.    Through the Website and related digital platforms, Defendants jointly conduct banking, lending, and financial-services business directed at consumers nationwide and serve consumers in California and throughout the United States.

## IV.    JURISDICTION AND VENUE

20.    This Court has personal jurisdiction over Defendants because Defendants have purposefully and deliberately availed themselves of the privilege of conducting business in California, maintain an active and growing physical-office presence in California, deliberately operate a website accessible to California consumers and have directed California-based ad-tech infrastructure at those consumers' communications, and Plaintiff's claims arise directly from Defendants' California-directed conduct.

21.    Defendants maintain physical office locations across California, including private banking and/or commercial banking offices in San Francisco, Mill Valley, Los Angeles, Newport Beach, and San Diego.  Defendants have announced expanded California operations.

/ / /

5

22. Defendants are registered or otherwise qualified to do business in California, including without limitation through CITIZENS BANK, NATIONAL ASSOCIATION's registration to do business in California, and through such authorizations, registrations, and licenses as are required to conduct Defendants' banking, lending, and financial-services operations in California.

23. Defendants operate the Website on a top-level domain directed to California consumers without any California-specific gating or geolocation restriction. The Website is the conduct at issue in this Complaint, and California consumers visiting the Website are the population from which Defendants intercept communications.

24. Defendants deliberately installed and continue to operate Google ecosystem tracking infrastructure on the Website. Google LLC is a California limited liability company headquartered in Mountain View, California. Defendants' deliberate installation of Google endpoints causes outbound HTTP requests bearing California users' page URLs, page titles, descriptive event slugs that explicitly reveal page contents and a single Google Ads conversion linker identifier funneled across multiple Google endpoints, to flow continuously to Google's California-based infrastructure.

25. Defendants deliberately installed and continue to operate Demandbase tracking infrastructure on the Website. Demandbase, Inc. is headquartered in San Francisco, and operates the endpoint api.company-target.com from California-based servers. Defendants' deliberate installation of Demandbase tracking causes outbound HTTP requests bearing California users' page URLs (including the verbatim search-query URL), page titles, and previous-page referrers to flow continuously to Demandbase's California-based infrastructure.

26. Plaintiff's claims arise directly out of and relate to these California-directed contacts. When Plaintiff visited the Website, Defendants' deliberately installed California-directed tracking infrastructure caused Plaintiff's communications with the Website, including his verbatim search query for "debt management," the URLs of the articles he read concerning debt reduction and ways to reduce financial stress, and the

6

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

verbatim titles of those articles, to be transmitted in real time to the California-based Google ecosystem infrastructure, the California-based Demandbase infrastructure, and the additional Microsoft, Qualtrics, and Glassbox tracking infrastructure operating on Defendants' Website, accompanied by persistent user-level identifiers.

27. Exercise of personal jurisdiction in this District over Defendants for these California-arising claims is reasonable and consistent with traditional notions of fair play and substantial justice.

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

29. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

30. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendants' state of citizenship, satisfying CAFA's minimal-diversity requirement.

31. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendants regularly transact business in this District, operate the Website that serves California residents in this District, and are subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from his Tulare County residence; (3) Plaintiff resides in this District; and (4) Defendants derive substantial revenue from California consumers in this District.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## V.    FEDERAL AND STATE PRIVACY LAWS

### 1.    The California Invasion of Privacy Act (CIPA)

32.    The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

33.    Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

34.    CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries sufficient to establish Article III standing.

35.    Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

### 2.    The Federal Wiretap Act

36.    The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of

8

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

37. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

38. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

39. Defendants jointly own, operate, and control the Website, the consumer-facing digital channel through which Defendants offer and market their banking, lending, deposit, and financial-services products to consumers nationwide. The Website includes public-facing content on credit, debt and related personal-finance topics, and includes an on-site search feature whose user-typed query terms are encoded directly in the search-results URL (specifically, in the query parameter of /search/answers.aspx?query=<term>), with the result that a visitor's search-query input becomes part of the URL of the page the visitor is reading.

40. Defendants' own Online Privacy Policy, which applies jointly to Citizens Financial Group, Inc., and Citizens Bank, N.A. (operating together under the unified label "Citizens"), expressly admits that Defendants collect from California visitors to the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Website the visitor's browsing and search history. The categories Defendants admit to collecting are the very same human-readable communication content categories that the Trackers intercepted from Plaintiff during his session on the Website, including his verbatim search query for "debt management," the verbatim URL paths of the four articles he read concerning credit-card-debt payoff strategies, the debt snowball method, budgeting to pay off debt, and ways to reduce financial stress, and the verbatim page titles of those articles transmitted to the Trackers.

41. Defendants further admit that they share the foregoing communication content with third-party service providers including advertisers and marketers, and that they use the foregoing communication content for marketing and promotional purposes to show California visitors advertisements for products and services tailored to the visitor's interests on social media and other websites.

42. Defendants further admit that the third-party advertising networks they have installed on the Website operate by causing the recognition of a unique cookie on the visitor's device that allows the advertising network to keep track of sites the visitor has visited that is associated with the network, and that the cross-site browsing record so accumulated is used to target advertisements to the visitor on the Website, on third-party websites, and across mobile applications. Defendants thereby admit that the intercepted communication content of Plaintiff's and the Class members' Website communications is monetized through Defendants' commercial advertising and identity-resolution arrangements with the Trackers identified herein.

43. During his use of the Website, Plaintiff navigated to the following URLs, unaware that Defendants were causing and permitting Third Parties to intercept the content of his communications:

- https://www.citizensbank.com/search/answers.aspx?query=debt%20management;
- https://www.citizensbank.com/learning/heloc-to-pay-off-credit-card-debt.aspx;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx;
- https://www.citizensbank.com/learning/what-is-the-debt-snowball-pay-down-method.aspx;
- https://www.citizensbank.com/learning/ways-to-reduce-financial-stress.aspx.

44.    Plaintiff alleges that the tracking mechanisms described below operated on the Website during Plaintiff's visits to the URLs identified above and intercepted the substantive contents of his communications with the Website. The figures that appear in the per-tracker subsections below depict the tracking behavior that the Website is configured to produce when a user visits the URLs, and evidence that Defendants' deliberately installed tracking infrastructure intercepted the contents of communications with the Website during Plaintiff's and the class members' Website use.

45.    Beyond the URLs, each Tracker receives, during each of those page loads, the page URLs identifying the content Plaintiff was viewing transmitted as named payload parameters, the page titles transmitted as named payload parameters, descriptive event slugs that themselves restate the content of each page, and the source-page URL transmitted in the Referer header or, where applicable, in a referrer URL parameter. Each of those fields communicates the substance, purport, or meaning of what Plaintiff was reading or searching for on the Website, and is therefore content of Plaintiff's electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8). Each Tracker section below illustrates what occurs during live browser access to those pages.

*1.    The Glassbox Tracker*

46.    Defendants embedded and deployed a Glassbox tracker on the Website operating at report.citizen.glassboxdigital.io. Glassbox is a third-party tracker whose function on the Website is to receive, in transit, the contents of users' communications with the Website in URL form, including the verbatim page URL of each page the user

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

is browsing and descriptive page-segment slugs identifying the page section.

47. The Glassbox tracker fires automatically when a user visits the Website, transmitting the page URL of the page the user is browsing (in the POST body parameter r=), a descriptive segment slug identifying the page section (in the seg= parameter), and a persistent Glassbox visitor identifier (_cls_v) together with a session identifier (_cls_s) and a Glassbox page identifier (pid). Glassbox Digital Ltd. uses the intercepted URL content to construct engagement analytics that are made available to its publisher clients, including Defendants, and tied to the persistent Glassbox visitor identifier.

48. Plaintiff visited the Website at https://www.citizensbank.com/search/answers.aspx?query=debt%20management, a search-results URL that, on its face, communicates the substance of Plaintiff's verbatim search query for "debt management" to anyone who reads the URL. When Plaintiff navigated to that URL, the Website caused Plaintiff's browser to transmit a Glassbox POST request to report.citizen.glassboxdigital.io that carried the verbatim search-query URL in the POST body and the persistent Glassbox visitor and session identifiers in the same request. The verbatim search-query URL and the persistent identifiers appeared in the same outbound request.

49. Figure 1 is a Fiddler Classic raw request capture showing a POST request transmitted from the user's browser to Glassbox's data collection servers at report.citizen.glassboxdigital.io. The request contains, in the POST body, r=https://www.citizensbank.com/search/answers.aspx?query=debt%20management (the verbatim search-query URL), a page-segment slug in the seg= parameter, a persistent Glassbox visitor identifier in the _cls_v cookie, a Glassbox session identifier in the _cls_s cookie, and a Glassbox page identifier in the pid parameter, establishing that the page URL containing the user's verbatim search query for "debt management" was transmitted to Glassbox in the same outbound request as Glassbox's persistent visitor and session identifiers.

///

12

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1**



50.    Plaintiff also visited the Website at https://www.citizensbank.com/learning/ways-to-reduce-financial-stress.aspx, a personal-finance article URL whose URL path expressly identifies the article's subject matter as concerning the reduction of financial stress. When Plaintiff navigated to that URL, the Website again caused Plaintiff's browser to transmit a Glassbox POST request to report.citizen.glassboxdigital.io that carried the full article URL in the POST body and the persistent Glassbox visitor and session identifiers in the same request.

51.    Figure 2 is a Fiddler Classic raw request capture showing a POST request transmitted from the user's browser to Glassbox's data collection servers at report.citizen.glassboxdigital.io. The request contains, in the POST body, r=https://www.citizensbank.com/learning/ways-to-reduce-financial-stress.aspx (the verbatim article URL), a page-segment slug in the seg= parameter, the same categories of persistent Glassbox identifiers (_cls_v visitor identifier, _cls_s session identifier, and pid page identifier) shown in Figure 1, establishing that the article URL identifying the user's interest in personal-finance-stress content was transmitted to Glassbox in the same

13

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

outbound request as Glassbox's persistent identifiers.

**<u>Figure 2</u>**

52.    Glassbox's servers at report.citizen.glassboxdigital.io returned HTTP 200 OK responses to each of the tracking requests, confirming that Glassbox received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

53.    Glassbox Digital Ltd. used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity to construct engagement analytics tied to the persistent Glassbox visitor identifier. This commercial use of intercepted content is precisely what the Glassbox tracker is designed and marketed to accomplish.

54.    Glassbox Digital Ltd. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendants aided and abetted Glassbox's interception by embedding and configuring the Glassbox tracker on the Website. By causing Glassbox to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

§ 631 and 18 U.S.C. § 2511(1)(a).

## 2.    *The Google Trackers*

55.    Defendants embedded and deployed a coordinated suite of Google trackers on the Website, operated by Google LLC across three distinct tracking endpoints: googleads.g.doubleclick.net (Google Ads conversion tracking), ad.doubleclick.net (DoubleClick Floodlight remarketing and audience measurement), and www.google.com/ccm/collect (Google's server-side measurement protocol, which sidesteps third-party cookie blocking mechanisms by transmitting data directly from Defendants' configuration to Google without requiring third-party cookies).

56.    The Google ecosystem trackers fire automatically when a user visits the Website, transmitting the page URL (in the url, u3, or dl parameters depending on the endpoint), the verbatim page title (in the tiba or dt parameters), descriptive event slugs that themselves restate the content of each page (in the u2 parameter, including for example "learning-budgeting-topayoffdebt-view," "learning-debtsnowballpaydownmethod-view," "learning-financialstress-view," "learning-heloctopayoffcreditcarddebit-view," and "search-answers-view"), the persistent IDE third-party advertising cookie on .doubleclick.net, and a Google Ads conversion linker identifier, transmitted as a URL parameter and mirroring a first-party _gcl_au cookie that Defendants have caused to be stored on the visitor's browser under the .citizensbank.com domain). Defendants operate two distinct Google Ads conversion accounts simultaneously, causing the same browsing data to be transmitted in parallel to both Google Ads conversion accounts on every page load. The same auid value is funneled across all four Google endpoints, enabling Google LLC to join the data flowing from each endpoint into a single Google-identified user record.

57.    Plaintiff visited the Website at https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx, a personal-finance article URL whose URL path and title ("How to Budget to Pay off Debt | Citizens") expressly disclose the article's subject matter as concerning budgeting to pay

off debt. When Plaintiff navigated to that URL, the Website caused Plaintiff's browser to transmit a coordinated set of Google ecosystem tracking requests to googleads.g.doubleclick.net, ad.doubleclick.net, and www.google.com/ccm/collect, each of which carried the article URL or page title, a descriptive event slug, and the same Google Ads conversion linker identifier. The article URL, the article title, the descriptive event slug, and the persistent Google identifier appeared in the same outbound requests.

58. Figure 3 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Google's DoubleClick Floodlight servers at ad.doubleclick.net. The request contains the descriptive event slug u2=learning-budgeting-topayoffdebt-view (which itself restates the substance of the page the user is reading), the full URL of the page the user was browsing (https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx) and a persistent DoubleClick Floodlight identifier, establishing that the page URL identifying the user's interest in budgeting-to-pay-off-debt content, together with a descriptive event slug that itself communicates the substance of the page, was transmitted to Google in the same outbound request as a persistent Google identifier.

**Figure 3**

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

59.    Figure 4 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Google's advertising servers at googleads.g.doubleclick.net. The request contains the full URL of the page the user was browsing (https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx) in the url parameter, the verbatim page title "How to Budget to Pay off Debt | Citizens" in the tiba parameter, and a Google Ads conversion linker identifier, establishing that the page URL containing the user's interest in budgeting-to-pay-off-debt content and the verbatim page title were transmitted to Google in the same outbound request as the identifier linking the user's browser to Defendants' first-party tracking, and that the same Google identifier value was simultaneously funneled across two distinct Google endpoints.

**Figure 4**

60.    Figure 5 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Google's server-side measurement endpoint at www.google.com/ccm/collect. The request contains the full URL of the page the user was browsing (https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx)

17

in the dl parameter, the verbatim page title in the dt parameter, and the Google identifier establishing that the page URL and page title were transmitted in parallel to a third Google endpoint, that the same Google identifier was funneled across all three Google endpoints documented in Figures 3, 4, and 5, and that Google's server-side measurement endpoint received the user's verbatim page-URL and page-title contents through an endpoint that sidesteps third-party cookie blocking mechanisms.

**<u>Figure 5</u>**

61.     When Plaintiff navigated to the foregoing URLs, the Website again caused Plaintiff's browser to transmit the same coordinated set of Google ecosystem tracking requests to ad.doubleclick.net, googleads.g.doubleclick.net, and www.google.com/ccm/collect, each of which carried the corresponding article URL, the verbatim article title in the tiba or dt parameters, and descriptive event slugs that themselves restate the substance of each page, together with the same persistent Google identifiers documented in Figures 3, 4, and 5, including the auid Google Ads conversion linker identifier and the auiddc DoubleClick Floodlight identifier.

62.     When         Plaintiff         navigated         to https://www.citizensbank.com/search/answers.aspx?query=debt%20management,   the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Website caused Plaintiff's browser to transmit corresponding Google Ads and DoubleClick Floodlight requests carrying the verbatim search-query URL together with the same persistent Google identifiers and the descriptive event slug "search-answers-view."

63. Google's servers at googleads.g.doubleclick.net, ad.doubleclick.net, and www.google.com/ccm/collect returned HTTP 200 OK or HTTP 204 No Content responses to the Google ecosystem tracking requests, confirming that Google LLC received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

64. Google LLC used the intercepted browsing data, including the URLs and verbatim page titles identifying Plaintiff's browsing activity, the descriptive event slugs that themselves restate the content of each page, and the joined identifier graph created by funneling the same auid value across three Google endpoints, to build advertising profiles, power real-time bidding auctions, and enable interest-based and remarketing-based advertising campaigns across the Google Ads programmatic-advertising ecosystem. The persistent IDE cookie set on .doubleclick.net (on information and belief, approximately 390-day expiration), the NID cookie set on .google.com (on information and belief, approximately 180-day expiration), and the first-party _gcl_au cookie set on .citizensbank.com (mirrored to Google as the auid URL parameter), enable Google LLC to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and websites. This commercial use of intercepted content is precisely what the Google ecosystem trackers are designed and marketed to accomplish.

65. Google LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendants aided and abetted Google's interception by embedding and configuring the Google ecosystem trackers on the Website, including by causing the first-party conversion linker cookie to be stored on Defendants' own .citizensbank.com domain and mirrored to Google as the auid URL parameter, by

operating two parallel Google Ads conversion accounts, and by deploying Google's server-side ccm/collect measurement endpoint that sidesteps third-party cookie blocking. By causing Google LLC to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### 3.    The Microsoft Bing UET Tracker

66.    Defendants embedded and deployed a Microsoft Bing UET (Universal Event Tracking) tracker on the Website, operated by Microsoft Corporation through its bat.bing.com infrastructure. The Microsoft Bing UET tracker fires automatically when a user visits the Website, transmitting the page URL of the page the user is browsing, the verbatim page title, and persistent Microsoft cross-site advertising identifiers including the MUID third-party advertising cookie and the msclkid click-identifier URL parameter. The msclkid value captured during Plaintiff's session and the corresponding gcldc Google cross-platform click-identifier value captured contemporaneously during Plaintiff's same browsing session evidence that Microsoft and Google shared the same click-identifier value across their advertising ecosystems on Plaintiff's actual session and that Plaintiff arrived at the Website via a Microsoft-served advertisement whose click-identifier had been synchronized into Google's advertising infrastructure as well.

67.    When Plaintiff navigated to the Website at https://www.citizensbank.com/search/answers.aspx?query=debt%20management, the Website caused Plaintiff's browser to transmit a Microsoft Bing UET request to bat.bing.com that carried the verbatim search-query URL in the p= URL parameter, the page title in the tl= parameter, and the persistent Microsoft identifiers MUID and msclkid in the same request.

68.    Figure 6 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Microsoft's Bing UET servers at bat.bing.com/action/0. The request contains, in the p= URL parameter, the verbatim search-query                                                                                  URL

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

https://www.citizensbank.com/search/answers.aspx?query=debt%20management, a persistent Microsoft Bing UET visitor identifier in the vid= parameter, the page title in the tl= parameter, and an HTTP Set-Cookie response setting the MUID cross-site advertising cookie on .bing.com with an expires date of Saturday, June 5, 2027 (approximately thirteen months from capture), establishing that the page URL containing the user's verbatim search query for "debt management" was transmitted to Microsoft in the same outbound request as Microsoft's persistent identifiers, and that Microsoft simultaneously deposited a long-duration cross-site advertising cookie on the user's browser tying the user's verbatim search query to a continuing Microsoft advertising profile.

**<u>Figure 6</u>**

69. When Plaintiff navigated to https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx, the Website again caused Plaintiff's browser to transmit a Microsoft Bing UET request to bat.bing.com that carried the full article URL in the p= parameter, the verbatim article title in the tl= parameter, and the same persistent Microsoft identifiers.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

70.    Figure 7 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Microsoft's Bing UET servers at bat.bing.com/action/0. The request contains, in the p= URL parameter, the verbatim article URL https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx, the verbatim page title in the tl= parameter, and the same persistent Microsoft Bing UET identifiers shown in Figure 6, establishing that the article URL identifying the user's interest in budgeting-to-pay-off-debt content was transmitted to Microsoft in the same outbound request as Microsoft's persistent identifiers.

**Figure 7**



71.    When Plaintiff navigated to https://www.citizensbank.com/learning/heloc-to-pay-off-credit-card-debt.aspx, https://www.citizensbank.com/learning/what-is-the-debt-snowball-pay-down-method.aspx, and https://www.citizensbank.com/learning/ways-to-reduce-financial-stress.aspx, the Website again caused Plaintiff's browser to transmit Microsoft Bing UET requests to bat.bing.com that carried the respective article URLs in the p= parameter, the verbatim article titles in the tl= parameter, and the same persistent Microsoft Bing UET identifiers documented in Figures 6 and 7.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

72. Microsoft's servers at bat.bing.com returned HTTP 200 OK responses to the Bing UET tracking requests, confirming that Microsoft Corporation received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

73. Microsoft Corporation used the intercepted browsing data, including the URLs and verbatim page titles identifying Plaintiff's browsing activity, together with the cross-platform click-identifier synchronization between Microsoft's msclkid and Google's gcldc captured in Plaintiff's same session, to build advertising profiles, drive interest-based advertising campaigns across Microsoft Advertising and the Microsoft Audience Network, and join Plaintiff's browsing activity into the broader cross-platform advertising identity graph spanning Microsoft and Google.

74. The persistent MUID cookie set on .bing.com (with a Set-Cookie expires date of approximately thirteen months from capture) and the first-party _uetvid Microsoft Bing UET visitor identifier cookie Defendants have caused to be stored on .citizensbank.com enable Microsoft Corporation to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and websites. This commercial use of intercepted content is precisely what the Microsoft Bing UET tracker is designed and marketed to accomplish.

75. Microsoft Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendants aided and abetted Microsoft's interception by embedding and configuring the Microsoft Bing UET tracker on the Website, including by causing the first-party _uetvid Microsoft Bing UET visitor identifier cookie to be stored on Defendants' own .citizensbank.com domain. By causing Microsoft Corporation to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## 4. The Demandbase Tracker

76. Defendants embedded and deployed a Demandbase identity-resolution and firmographic tracker on the Website, operated by Demandbase, Inc. through its api.company-target.com infrastructure. Demandbase, Inc. is headquartered in San Francisco, California, and operates a B2B identity-graph and firmographic-targeting platform that resolves website visitors to specific organizations, industries, and geographic locations and merges that identity data into a broader cross-publisher identity graph. The Demandbase tracker fires automatically when a user visits the Website, transmitting the page URL of the page the user is browsing, the previous-page referrer URL, and a persistent Demandbase user identifier. Defendants have further enabled a LiveRamp identity-graph integration that relays a LiveRamp user identifier to Demandbase alongside the Demandbase tuuid identifier, joining Defendants' intercepted data into the broader LiveRamp cross-publisher identity graph.

77. When Plaintiff navigated to https://www.citizensbank.com/search/answers.aspx?query=debt%20management, the Website caused Plaintiff's browser to transmit a Demandbase request to api.company-target.com that carried the verbatim search-query URL in the page= parameter and the persistent Demandbase tuuid identifier in the same request.

78. Figure 8 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Demandbase's identity-resolution servers at api.company-target.com/api/v3/ip.json. The request contains, in the page= URL parameter, the verbatim search-query URL https://www.citizensbank.com/search/answers.aspx?query=debt%20management, the verbatim page title in the page_title= parameter, the previous-page referrer URL in the referrer= parameter, and the persistent Demandbase visitor identifier in the request, with the response payload returning the California-state geolocation registry_state=CA, establishing that the page URL containing the user's verbatim search query for "debt management" was transmitted to Demandbase in the same outbound request as

24

Demandbase's persistent tuuid visitor identifier, and that Demandbase simultaneously resolved the request to California geolocation.

**Figure 8**

79.    When    Plaintiff    navigated    to https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx,    the    Website again caused Plaintiff's browser to transmit a Demandbase request to api.company-target.com that carried the full article URL in the page= parameter, the verbatim article title in the page_title= parameter, the previous-page referrer URL in the referrer= parameter, and the same persistent Demandbase tuuid identifier.

80.    Figure 9 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Demandbase's identity-resolution servers at api.company-target.com/api/v3/ip.json. The request contains, in the page= URL parameter, the verbatim article URL https://www.citizensbank.com/learning/budgeting-to-pay-off-debt.aspx, the verbatim page title "How to Budget to Pay off Debt | Citizens" in the page_title= parameter, and the same persistent Demandbase tuuid identifier shown in Figure 8, establishing that the article URL identifying the user's interest in budgeting-to-pay-off-debt content and the verbatim article title were transmitted to Demandbase in

25

the same outbound request as Demandbase's persistent identifier.

**Figure 9**



81.     When Plaintiff navigated to https://www.citizensbank.com/learning/heloc-to-pay-off-credit-card-debt.aspx,    https://www.citizensbank.com/learning/what-is-the-debt-snowball-pay-down-method.aspx,                                    and https://www.citizensbank.com/learning/ways-to-reduce-financial-stress.aspx,    the Website again caused Plaintiff's browser to transmit Demandbase requests to api.company-target.com that carried the respective article URLs in the page= parameter, the verbatim article titles in the page_title= parameter, the previous-page referrer URLs in the referrer= parameter, and the same persistent Demandbase tuuid identifier documented in Figures 8 and 9.

82.     Demandbase's servers at api.company-target.com returned HTTP 200 OK responses to the Demandbase tracking requests, confirming that Demandbase, Inc. received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

83.     Demandbase, Inc. used the intercepted browsing data, including the URLs and verbatim page titles identifying Plaintiff's browsing activity, to perform cross-

26

publisher identity resolution, firmographic and geographic targeting, and audience segmentation across Demandbase's B2B identity-resolution platform. The persistent tuuid cookie set on .company-target.com with a Max-Age of approximately 396 days, together with the LiveRamp identity-graph integration through which a LiveRamp user identifier was relayed to Demandbase alongside Defendants' user data, enable Demandbase, Inc. to link Plaintiff's communications with the Website to a continuing user profile across sessions, publishers, and identity-graph data partners. This commercial use of intercepted content is precisely what the Demandbase identity-resolution tracker is designed and marketed to accomplish.

84. Demandbase, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendants aided and abetted Demandbase's interception by embedding and configuring the Demandbase tracker on the Website and by enabling the LiveRamp identity-graph integration that joined Demandbase's tuuid identifier to a broader cross-publisher identity graph. By causing Demandbase, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### 5. *The Qualtrics SiteIntercept Tracker*

85. Defendants embedded and deployed a Qualtrics SiteIntercept tracker on the Website, operated by Qualtrics, LLC at siteintercept.qualtrics.com. The Qualtrics SiteIntercept tracker operating on the Website is configured to receive, in transit, the contents of users' communications with the Website in URL form, including the verbatim URL of each page the user is browsing. The Qualtrics tracker fires automatically when a user visits the Website, transmitting the verbatim URL of the page the user is browsing and a persistent Qualtrics visitor identifier in the same outbound request. Qualtrics, LLC uses the intercepted URL content to construct experience-management analytics that are made available to its publisher clients, including

27

Defendants.

86.    When Plaintiff navigated to https://www.citizensbank.com/learning/heloc-to-pay-off-credit-card-debt.aspx, a personal-finance article URL whose URL path expressly identifies the article's subject matter, the Website caused Plaintiff's browser to transmit a Qualtrics request to siteintercept.qualtrics.com that carried the verbatim article URL in the Q_LOC= URL parameter and the persistent Qualtrics visitor identifier in the same request.

87.    Figure 10 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Qualtrics's tracking infrastructure at siteintercept.qualtrics.com/WRSiteInterceptEngine/Targeting.php.    The request contains, in the Q_LOC= URL parameter, the verbatim article URL https%3A%2F%2Fwww.citizensbank.com%2Flearning%2Fheloc-to-pay-off-credit-card-debt.aspx, and the persistent Qualtrics visitor identifier cookie QuantumMetricUserID in the same request, establishing that the article URL identifying the user's interest in HELOC-to-pay-off-credit-card-debt content was transmitted to Qualtrics in the same outbound request as Qualtrics's persistent visitor identifier.

**<u>Figure 10</u>**

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

88.    When Plaintiff navigated to https://www.citizensbank.com/learning/what-is-the-debt-snowball-pay-down-method.aspx, a personal-finance article URL whose URL path expressly identifies the article's subject matter as concerning the debt snowball pay-down method, the Website again caused Plaintiff's browser to transmit a Qualtrics request to siteintercept.qualtrics.com that carried the verbatim article URL in the Q_LOC= URL parameter and the same persistent Qualtrics visitor identifier in the same request.

89.    Figure 11 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Qualtrics's tracking infrastructure at siteintercept.qualtrics.com/WRSiteInterceptEngine/Targeting.php.    The request contains,    in    the    Q_LOC=    URL    parameter,    the    verbatim    article    URL https%3A%2F%2Fwww.citizensbank.com%2Flearning%2Fwhat-is-the-debt-snowball-pay-down-method.aspx, and the same persistent Qualtrics visitor identifier cookie QuantumMetricUserID shown in Figure 10, establishing that the article URL identifying the user's interest in the debt snowball pay-down method was transmitted to Qualtrics in the same outbound request as Qualtrics's persistent visitor identifier.

## Figure 11



29

90.    When Plaintiff navigated the Website, the Website again caused Plaintiff's browser to transmit Qualtrics requests to siteintercept.qualtrics.com that carried the respective verbatim URLs in the Q_LOC= URL parameter and the same persistent Qualtrics visitor identifier documented in Figures 10 and 11.

91.    Qualtrics's servers at siteintercept.qualtrics.com returned HTTP 200 OK responses to the Qualtrics tracking requests, confirming that Qualtrics, LLC received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

92.    Qualtrics, LLC used the intercepted browsing data, including the verbatim URLs identifying Plaintiff's browsing activity, to construct experience-management analytics and audience-segmentation outputs tied to the persistent Qualtrics visitor identifier. This commercial use of intercepted content is precisely what the Qualtrics SiteIntercept tracker is designed and marketed to accomplish.

93.    Qualtrics, LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendants aided and abetted Qualtrics's interception by embedding and configuring the Qualtrics SiteIntercept tracker on the Website. By causing Qualtrics, LLC to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**6.    *Persistent Identifier Storage Across the Trackers***

94.    The Trackers' persistent identifier mechanisms are stored on the visitor's browser as cookies, including both third-party cookies on each Tracker's own domain and first-party cookies on Defendants' .citizensbank.com domain that mirror tracker identifiers.

95.    Figure 12 is a Chrome DevTools Application Cookies panel scoped to the Website. The third-party persistent cookies visible include MUID on .bing.com (expires June 5, 2027); IDE and test_cookie on .doubleclick.net; NID on .google.com; tuuid on

.company-target.com (approximately 396 days); and _cls_v and _cls_s on .glassboxdigital.io. The first-party cookies on Defendants' .citizensbank.com domain include _gcl_au (mirroring the auid identifier transmitted to Google), _uetvid (Microsoft Bing UET visitor identifier), and usprivacy=1NNN, in which the third-party-opt-out bit is cleared and no third-party opt-out signal is honored.

**Figure 12**



### 7.    *Absence of Privacy-Protective Anonymization*

96.    Defendants did not configure the Trackers to apply commercially recognized privacy-protective anonymization parameters when transmitting Plaintiff's and the Class Members' communications. The Google ecosystem requests depicted in Figures 3 through 5 transmit npa=0, confirming that non-personalized-ads mode is disabled and personalized advertising is enabled on the user's session. Those Google requests do not contain the aip IP-anonymization parameter, and no request depicted in Figures 1 through 11 contains a gdpr_consent value or other affirmative consent signal. The first-party usprivacy=1NNN cookie depicted in Figure 12 confirms that the third-party-opt-out bit is affirmatively cleared on Defendants' own .citizensbank.com domain

31

and is transmitted on each outbound Tracker request.

### 8.    *Real-Time Tracker Activation During Page Load*

97.    The Trackers fire automatically during the Website's page-load process, contemporaneously with, and while, Plaintiff's communications with the Website are in transit. The Fiddler Classic raw request captures shown in Figures 1 through 11 each depict a tracker request transmitted during the page-load process, with no user interaction required to trigger the transmission of the user's communications with the Website. The Persistence Cookies panel shown in Figure 12 confirms that the persistent identifier infrastructure for each Tracker is maintained on the user's browser across multiple page loads in a single session, enabling each Tracker to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and contexts. An independent attempt to capture an external network waterfall of the Website's page-load timing was blocked by Defendants' bot-detection infrastructure, which returned an HTTP 403 Access Denied response to the external waterfall-capture request; the concurrent firing of the Trackers during page load is, accordingly, established through the Fiddler captures and the persistence-cookie capture rather than through a waterfall figure.

98.    Together, Figures 1 through 12 confirm that the Trackers' interception of Plaintiff's communications with the Website occurs in real time, while those communications are in transit between Plaintiff's browser and the Website's servers, and that the Third Parties maintain persistent identifier infrastructure on Plaintiff's browser that ties each intercepted communication to a continuing cross-session user profile, without any privacy-protective anonymization parameters or honored opt-out signals applied by Defendants.

## VII.   CLASS ALLEGATIONS

99.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

/ / /

All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers between May 1, 2025 and the present.

100.  NUMEROSITY:  Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendants.

101.  COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendants configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendants' conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendants' conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendants' conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Defendants' conduct violates the California Constitution;
- Whether Defendants' conduct constitutes an intrusion upon seclusion;
- Whether Defendants were unjustly enriched at Plaintiff's and Class Members' expense;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- Whether Class Members are entitled to restitution.

102.  TYPICALITY:  As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

103.  ADEQUACY:  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

104.  SUPERIORITY:  A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII.  FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against All Defendants

105.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

106.  Plaintiff brings this cause of action on behalf of himself and the Class.

107.  California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

108.  The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received

34

human-readable copies of URL strings in the same HTTP request or response in which the Website servers received them, while that communication was in transit between Plaintiff's browser and the Website.

109. Defendants intentionally configured their website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

110. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX.    SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against All Defendants

111. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Plaintiff brings this cause of action on behalf of himself and the Class.

113. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

114. The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the

35

Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit.

115. Defendants intentionally configured their website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

116. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendants through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X. THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against All Defendants

117. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

118. Plaintiff brings this cause of action on behalf of himself and the Class.

119. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendants' conduct constitutes both an unlawful and an unfair business practice.

120. Defendants' conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendants violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

121. Defendants' conduct is also unfair. Defendants covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class, including but not limited to the interception and commercial exploitation of sensitive personal-finance browsing data and the financial value thereof, is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

122. The unfair character of Defendants' conduct is further established by the gap between Defendants' own privacy disclosures and their actual practice: Defendants' Online Privacy Policy expressly admits that Defendants will endeavor to recognize commercially recognized opt-out signals including the Global Privacy Control, yet Defendants have caused to be deposited on California users' browsers a first-party usprivacy=1NNN cookie in which the third-party-opt-out bit is affirmatively cleared, and Defendants transmit that same usprivacy=1NNN value to each Tracker on each outbound tracking request, confirming that, in practice, Defendants do not honor any opt-out signal from California consumers.

123. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendants' conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendants used that intercepted URL content to build advertising profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

124. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendants and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the form of advertising revenue and real-time-bidding clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

125. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendants from continuing their unlawful and unfair practices, restitution of monies acquired by Defendants through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI.    FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against All Defendants

126. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

127. Plaintiff brings this cause of action on behalf of himself and the Class.

128. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

129. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising, profiling, and identity-resolution purposes without disclosure or consent.

130. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person

38

visiting a national-bank consumer-facing website like www.citizensbank.com does not expect that the specific pages they browse, the specific search terms they submit, the specific personal-finance articles they read concerning debt-payoff strategies and financial stress, and the verbatim titles of those articles will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles and cross-platform identity graphs, and used for advertising targeting, analytics, and commercial monetization.

131. Defendants' conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring five categories of third-party tracking technologies on the Website, Defendants caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to third parties where they were linked to persistent cross-session profiles and cross-platform identity graphs and used for commercial advertising and identity-resolution purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the sensitivity of the content browsed, the persistent, multi-year, and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

132. As a result of Defendants' invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII.   FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against All Defendants

133. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

134. Plaintiff brings this cause of action on behalf of himself and the Class.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

135. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

136. Defendants intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding five categories of third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

137. The intrusion is highly offensive to a reasonable person. Defendants covertly deployed tracking technologies that captured the specific content Plaintiff was browsing, and transmitted it to multiple third-party commercial entities for advertising targeting, identity-resolution, and analytics. The covert and non-consensual nature of the interception, the nature of the Website as a national-bank consumer-facing site and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data-analytics purposes, and the use of persistent cross-session and cross-platform identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

138. As a result of Defendants' intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

/ / /

/ / /

40

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## XIII.  SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against All Defendants

139.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

140.   Plaintiff brings this cause of action on behalf of himself and the Class.

141.   Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

142.   Defendants received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendants received monetary compensation, data licensing benefits, audience-targeting capabilities, conversion-tracking analytics, identity-resolution outputs, and other commercial value. Defendants' arrangement with these tracking operators enabled Defendants to offer analytics, retargeting, identity-resolution, and advertising services that generated commercial revenue and business value for Defendants themselves; Defendants, not the tracking operators, are the recipients of this benefit.

143.   Defendants received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendants and their tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

144.   It is inequitable for Defendants to retain the benefits of their data-for-services arrangement without compensating Plaintiff and Class Members whose

browsing activity was the source of that commercial value. Defendants' concealment of the tracking arrangement and their failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

145. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendants were unjustly enriched at Plaintiff's and Class Members' expense.

## XIV. PRAYER FOR RELIEF

146. WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendants' conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3. An order enjoining Defendants from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendants through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9. Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendants were unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

## XV.    DEMAND FOR JURY TRIAL

147.    Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.


Respectfully submitted,

Dated:   May 21, 2026          **LAW OFFICES OF ROSS CORNELL, APC**


By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED